The United States 2018-2005, Mr. McKinley. Good afternoon, your honors. Doug McPhill-Moaning. Yeah, you're correct. Good morning, your honors. Doug McKinley, I'm appearing on behalf of Peter Terping and about 300 other clients who brought suit against the United States government for breach of an implied contract. The lower court, the trial court dismissed our claim on a 12B6 motion and ruled that we had not set forth a factual basis sufficient to establish the formation of an implied contract in fact. The specific error that we're alleging the lower court made was the lower court held that it wasn't the government that made the contract, it was in fact one of the Hanford contractors. That in reality and in our complaint is simply incorrect. The government directed its contractor to make a contract, but it was in fact the government's direction just like you might direct one of your law clerks to write something for you. The government was the party that created the contract. And so if we look at the complaint, there's sort of two levels of facts. We can look at the facts that are alleged from sort of the 30,000 foot level, and then we can get down into the nitty gritty of it. Looking at the facts from the 30,000 foot level, what we essentially allege is the government created the multi-employer pension plan in 1987, the MEP, and then the government thereafter managed and dictated every aspect of it, you know, every amendment to it, how it was administered from 1987. That sounds like the 1,000 foot level. I'm sorry? That sounds like the 1,000 foot level. At the 30,000 foot level, it appears that these people have a claim against somebody, but why isn't it one of the government transferees, whether it's Lockheed or one of the other companies? I think that's an excellent question. It gets to the heart of the clause that's contained within the MEP that matters. Article 29 is the central focus of this entire discussion. And what Article 29 says is that when there is a termination for transfer, the plan administrator will make sure that the benefits continue to accrue with the new contractor. Now, that article, if we give it any thought at all, we realize that article could only have been formed by the government. It only could have been breached by the government. It only could have been enforced by the government. There's no other party who has the ability to enforce that article, that central promise of the MEP to my client, right? The contractor who's leaving, he can't dictate what terms the government are going to pay pensions to the incoming contractor. The incoming contractor can't dictate terms to the government. The only party, the only person who ever had that power to say whether the incoming contractor was going to continue in the MEP was the government. And so when you look at it from the 30,000-foot level or the 1,000-foot level, when you say the government created this thing, they managed this thing, they governed all the outcomes of it, the question is, could a reasonable finder of facts say that it is plausible, because that's our standard under Ashcroft and Iqbal, is it plausible that the government demonstrated that it assented to being bound by Article 29? And I think it's obvious that they assented to it. They assented to being bound by Article 29 because they created and then controlled all aspects of the MEP. You used the word transfer. They transferred responsibility and liabilities, too, didn't they? To the new contractors? Yes. Yes, certainly. So why isn't the government free of obligation? There wasn't a contract meeting of the minds for the government to retain responsibility for those claims. Well, the responsibility was to not do that. You have to focus on the language of Article 29. Article 29 says, in the case of the termination for transfer, an employee becomes a participant hereafter shall be entitled for credit for eligibility under Article 2, benefit service under Article 3, investing service under Article 6, to such as a degree as shall be determined by the planned administrator in order to assure that the participant receives his benefit at normal retirement date. Well, how is that going to happen if the government doesn't sign a contract with the new contractor, allowing the cost for the new contractor to pay into the MEP to provide that normal service allowance? The government's responsibility here is pretty narrow. It's only at the transition, only at the termination for transfer, is the government not supposed to use that opportunity to throw people out of the MEP. Okay? Once the termination for transfer has occurred, the government could go in and say to the contractors, okay, we're tired of paying a pension. Right? Tell all your people we're not going to pay a pension anymore. But the government didn't do that. The government said, we're going to set this thing up so that when we change contractors, when we go in there, at the moment we change contractors, we're not going to use that event to be the excuse for blowing you out of the pension plan. Okay? Any other time, they reserve the right to do it, I would argue. But at that moment, they won't do it. And then what do they do? They chose that exact moment to repudiate it. Now, I anticipate the government is going to make an argument that, well, it can't be, you know, you can't say that the government was ever bound to this thing and, you know, there's no evidence that the government was ever bound to this thing. But if we look at sort of, you know, okay, so ignoring the 30,000-foot level, let's get down into the weeds of what would the government do if they did consider themselves bound to it? That, in other words, what kind of activities would the government undertake if they did provide a cent to it? Well, one thing they would do is pay their pension for the rest of time, which is exactly what they did, because in 1996, when they repudiated it, they apparently felt guilty. And so they added this new clause, the January 15th Amendment, which said, okay, we're not going to give you credit for your service years, but we are going to give you your high five. So in other words, your pension is going to continue to go up. It's just not going to go up as much. Right? So who's paying for that? No longer do we have an employer who's part of the plan. My clients have been completely disconnected from the plan through any sort of employer, and the government makes that argument over and over and over again. They're completely bifurcated from the plan, but they're still participants in the plan. Counsel, there's no need to shout at the court. I'm sorry, I get excited. We hear you. Thank you, Your Honor. They're still participants in the plan. They're still going to get their pension when they retire. And their government is continuing to pay money into the plan to fund the high five benefit. So I don't understand how the government can say to you with a straight face that the government is not a party to any contract with my clients, when the government has spent decades paying into this plan on behalf of their high five benefit. So it's clear to me on that basis that the government is at a minimum tied to my clients through the plan. The question is only, are they then tied to what they originally agreed to, which was Article 29? Okay, so then again, we look back at the facts. If the government believed they were tied to Article 29 at the time, what would they do? Well, one thing they would do is, the first time the determination for transfer came up, they would put out a solicitation that required the incoming contractors to honor the map, which is exactly what they did. Now, admittedly, they were talked into repudiating it before they entered those contracts. But the very first thing they did was consistent with them being bound to the map. What else shows that they were bound to the map? Well, they had a policy. They had a written policy, DOE Order 350.1. That showed they were bound to the map. They had letters. They had written correspondence. They, you know, basically every single factor, every single thing that they ever could have done to show that they felt they were bound to the map, they did, except for one thing, and that's the repudiation that occurred ten years after they formed the map. You know, they formed the map in 1987 and put Article 29 in place, and then ten years later, in 1996, they repudiated it. But they don't repudiate it completely. They put in this, you know, January 15th Amendment, the High Five Amendment, and then they continue to pay for the next several decades into the map on behalf of my clients for the High Five Benefit. We will save the remainder of your time. I will, Your Honor. Mr. Iorossi, is it? Yes, Your Honor. Thank you very much. Albert Iorossi on behalf of the United States. Good morning. May it please the Court. The fundamental and threshold question that this Court has to answer is what was the alleged implied contract here, and does the amended complaint sufficiently allege that contract? If the Court can't answer that question, then it can't determine whether the complaint alleges all the required elements of the contract, like mutuality of intent, consideration, lack of ambiguity in the offer, and actual authority. It all becomes a fruitless exercise. But the problem the Court confronts here is that the appellants have never been able to specify precisely what the implied contract is. At times, they suggest that simply if an employee works on the reservation, all of their time counts for pension purposes. At other times, they suggest that Article 29 of the MEPP, and only Article 29, embody the terms of the contract. Sometimes they suggest that the entire MEPP is itself the contract. For example, at page 44 of their brief, appellants claim that certain governmental conduct is, quote, evidence of the government's assent that the government was bound to the terms of the MEPP, including Article 29. They repeat that statement at page 36 by saying the MEPP, and particularly Article 29 of the MEPP, is properly construed as an offer from the government to the appellants. The reason this vagueness, this ambiguity, is a problem for the appellants is that there can't be an implied contract if an express contract exists. So if the MEPP and all of the terms of the MEPP are what binds the government, then this Court, in Bank of Guam v. United States, 578 F. 3rd, 1318, held that the existence of an express contract precludes the existence of an implied-in-fact contract. Well, look, the government was originally obligated, right? They were liable to pay these employees pensions based on their length of tenure. No, Your Honor. I think that that's an important point here. The allegations in the complaint are worded carefully, I would say. And at oral argument today, counsel for the appellants have suggested how the government has paid into the pension, has paid the pension. In reality, and I don't think that the counsel for the plaintiffs would dispute this point, there has never been a dime that has been sent from the Federal Treasury to the pension fund itself. The only flow of money that has ever occurred has been from the Federal Government to the contractors that run the Hanford Nuclear Reservation. As part of the contract between the contractors and the Federal Government. These people were government employees at Hanford, right? Not at any relevant point to this court. Originally? The answer is I don't know for sure. It may be that at some point... What I'm getting at is that if they were obligated originally and it's not clear whether the contractors assumed the obligation, why isn't the government or the Navy or whoever still obligated? Well, because that's not what the complaint alleges. The complaint alleges that there was an implied contract based apparently either entirely on the MEPP or as a result of the creation of the MEPP. Because prior to 1987, there were a number of contractors working on the site, on the reservation. Those contractors had, and this is in the complaint, those contractors had their own pension plans. And any time the workers, any time the contract would change and the contractors performing the work on the reservation would change, then oftentimes the workers working for the government contractors would change companies and there would have to be some sort of movement or there was movement of the pension funds and obligations to the new contractors. You're saying if someone's liable, it's the contractors and they stood the wrong party. Well, I think that that's probably right, Your Honor. But the problem that the appellants have here is that the complaint suggests that there's an implied contract that arose from the creation of the, that's rooted in the creation of the MEPP. And the reason the court has to discern what the terms of that contract are is that without being able to tell what the promises the government made are, then the court can't tell whether there was mutuality of intent to contract, whether there was consideration, authority, et cetera. So, for instance, if, talking about mutuality of intent, if the court identifies the terms of the alleged contract, they have to address, the court has to address the contractual elements required to state a claim. And for mutuality of intent, there has to be some sort of nexus. There has to be proof or allegations of an intent by the federal government to contract and there has to be a nexus to the particular terms of the implied contract. In this case, the appellants have never been able to articulate what the promise is. Is it simply Article 29? If it's Article 29, nothing else, then there are no, none of the elements of the contract present in the complaint. There's no consideration, authority. The demonstration of intent that they point to in their brief are events that occurred over the space of 25 years. The creation of the MEPP in 1987, the solicitation of a new contract in 1996. They also point to letters that were sent in 2007 and 2011 to prove intent by the federal government to contract 30 years earlier. But the problem that the appellants face, again, is that at the same time, they are pointing to evidence of intent to contract by the federal government. They are also saying the federal government is repudiating their contract because they, they allege that in the, in September of 1996, when the federal government solicited bids to manage the reservation and get new contractors, that that was, that there was a repudiation of the implied contract. But they also say that at that same time, the government, that solicitation itself was evidence of intent to contract. And I keep coming back to the idea that the court has to figure out what the terms of the contract are. It's important to determine whether all of the elements are present in the contract. It's also vital to determine a dispositive issue that I want to touch upon in this case, and that's the question of the statute of limitations. As a threshold matter, the appellants have argued that we're not allowed to argue that statute of limitations issue here on appeal for the first time. Statute of limitations under Section 2501 is jurisdictional. We could have raised it for the very first time on appeal here. We didn't. We raised it at the court below, and the court rejected the argument. But what I'd like to focus on is that, for the statute of limitations here, if the appellants were correct that a mere repudiation of the contract does not begin the statute of limitations running, that's true. But this court has also held that any time there is any contractual non-performance under the contract, that starts the statute of limitations to run, and then six years after that non-performance, their statute of limitations would have expired and they would have been out of court. So if there was any sort of non-performance by the federal government under the terms of the contract, that is a breach and the statute of limitations would begin to run. We mentioned a few different reasons why. Wasn't there something about how the employees were told that if they had a problem with the change in the pension plan that they should take it up at the time of performance? I think it's Complaint Paragraph 87 or 89 that states that the government informed or told the plaintiffs that they couldn't challenge the determination. There's two issues there. One is that the complaint doesn't say they couldn't have brought suit. At best, it can be read to say that there's the plan administrator told them they can't challenge this sort of calculation. More fundamentally, however, the Supreme Court has made it clear in Bowles v. Russell as well as John R. Sand and Gravel Company and Soriano that there is no equitable tolling for the statute of limitations under 28 U.S. Code Section 2501. So even if they had been told you can't challenge this determination in court, which the complaint doesn't say, that doesn't equitably toll the running of the statute of limitations. But more importantly... When did the statute start to run? September 1996? Yes, and here's why. I'm going to bring back exactly what the plaintiffs' counsel just said a moment ago. The appellants have repeatedly argued in their brief and here 10 minutes ago that if the implied contract required anything at all, it required the government to only enter into contracts that would accomplish the objectives of Article 29. A minute ago the plaintiffs' counsel said the government's responsibility was very narrow. It was not supposed to use the opportunity of the change of contract to throw people out of the MEPP. And at page 12 of their brief, the appellants state the implied in fact contract with the appellants required the government to only enter into contracts with successor contractors that would accomplish the objective of Article 29 of the MEPP. They state the same thing on page 9 and page 31 of their brief. If the court accepts that as true, the government's responsibility under the contract was to only enter into contracts that affect Article 29. The government didn't do that in September of 1996. The appellants' counsel just said that. If that's the case, that was absolutely a case of contractual non-performance, and at that moment when the government entered into that contract, which did not accomplish the objectives of Article 29, that was a breach of the implied contract, and the statute of limitations began to run in 1996. It expired 6 years later, 14 years before they brought suit here. What about they were told they couldn't challenge the changes until retirement? You're saying that would not preclude suit. That's sort of a unilateral statement? First, there was a breach in 1996. Presumably, I think that if you look at the reservations, that would, that breach of a failure to enter into a contract that accomplishes the purpose of Article 29, if the court accepts that as a breach of the contract, that's contractual non-performance, statute of limitations begin to run. At some point later, the appellants had requested to challenge this determination that their years on the reservation would no longer count for the purpose of calculating pension benefits, even if they were told by the government that they couldn't challenge that determination. The complaint doesn't say they couldn't bring suit. Even if that were the case, that still doesn't toll the statute of limitations for the reason that I mentioned a couple of minutes ago. But the Supreme Court has expressly held that there's no equitable tolling of 2501 for the purpose of statute of limitations. That's the John R. Sand and Gravel Company, it's Bulls v. Russell. The question is when did the breach occur, if there was a breach? Well, as I just explained, the breach, if the court determines that the government had a responsibility, their promise, their obligation under the terms of any implied contract here was to enter into contracts that affected the purpose of Article 29, that would keep them, these appellants, in the pension plan the same way everyone else was and not, as Appellant's counsel described, throw them out. If that was their promise, the government breached that promise, that term of the contract, in 1996, because the only reason we're here in court today is because the government changed, or the plaintiffs alleged that the government entered into this contract that ended up with them being thrown out, not thrown out of the MEPP because I think that both parties agree they're in the MEPP, but changed the terms of their pension benefit calculations in a way that conflicts and contradicts Article 29. That failed, that entered, that execution of a contract by the Federal government with the reservation contractors, which failed to accomplish the purpose of Article 29, was the breach, and that happened in September 1996, and that's why the statute of limitations, which entirely disposes of this case, controls here. If there's nothing further, I yield the rest of my time. Thank you, Your Honors. Thank you, counsel. Mr. McKinley has five minutes plus. I'll try not to get excited and keep my voice down, Your Honor. The government's argument that when they didn't... Well, first off, let me clear up your apparent misunderstanding. My clients were never government employees. What happened was there were private contractors on the Hanford site, and the government came in and said, OK, this is how we're going to run your pensions. Instead of all of you having individual pensions, we're going to combine you into a multi-employer pension plan that's going to be the pension plan that governs all the contractors on the Hanford site. So they swept them all up in 87, put them in this pension plan together, and then from there on, the government micromanaged the plan. They controlled all the aspects of it. And that's why I argue that they formed an implied contract. They formed an implied contract that they wouldn't mess with the things that were set forth in the MEP. Now, as it turns out, they didn't really. You know, most of the terms of the MEP, there were no repudiations. There were no breaches. I've got nothing to complain about. The one thing I am complaining about is in 1996, they repudiated their obligation to honor Article 9. The government is arguing that's a breach, but the trial court below didn't hold that it was a breach. The trial court below correctly held that the only thing they could do with respect to Article 29 in 1996 was repudiate it, because by its own terms, Article 29 doesn't ripen until they retire. Okay? Again, we have to look very carefully at the language in Article 29. Article 29 says they won't do anything until normal retirement date. That's when it kicks in. Now, conceivably, the government could have kicked the contractor out of the plan and continued to allow the employees to enjoy it. And in fact, that's exactly what happened. Right? They stopped giving them credit for their years of service, but they continued to finance their high-five benefit. So the idea that the breach had to happen in 1996 is completely undone by what actually happened. What actually happened was the government repudiated one obligation, but continued a different one, a new one that they made up and wrote into the plan as an amendment. So the government's argument that that has to be a breach is completely contrary to the facts. The fact is the government did keep them in the plan. The government kept paying into the plan. All they did was say, we're not going to honor your years of service when the time comes, when it's time for you to retire. So the government was making contributions to the plan? Still is. The MEPP? Still is. Still is. The government pays... That's consistent with Article 10, which says each employer will make contributions to the plan. Well, the government pays the employers for all the obligations of the MEP, including my clients. So as counsel for the government represented, the government pays the employer who then puts it in the MEP. Right. But it's all the government's money. And the government sets up these contracts to say that it's an allowable cost. So the government could easily have set up these contracts to say... And, in fact, we would argue did set up these contracts to say that it's an allowable cost that my clients would be paid for all of their service years, because, you know, that clause still exists in the MEP. It wasn't removed from the MEP. So my clients should be entitled to all their service years on the day they retire. But they retire, they go to the MEP, they ask for all their service years, the MEP tells them no, and we say, OK, the government made a promise. And one other point I want to cover, the government had argued that there's a line of cases that says you can't have an express contract where you have an implied contract, but that's only true if the parties are the same. If I have an express written contract with the government, counsel's correct, I can't come in and argue that there's also an implied contract that rides alongside it, OK? But the express written contract here is not with the government as a party. The government didn't sign the MEP. They just created it and controlled it and micromanaged it from afar and tried to leave their fingerprints off it, OK? The implied contract was because the government was doing all those things, because the government created it, because the government was micromanaging it from afar, because all of that was going on, they impliedly assented to at least enforcing Article 29, where when there was a termination for transfer or when people retired, they wouldn't use the excuse of, well, there was a termination for transfer, and so we stopped paying you, we stopped allowing you to collect those benefits. Are there any other questions? Apparently not. Thank you, counsel. Thank you.